IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,
       Plaintiff,

v.                                                             Criminal No. 1:12-cr-25-2

JOHN N. SKRUCK,
       Defendant.

## REPORT AND RECOMMENDATION/OPINION

This matter is before the undersigned for consideration of Defendant John N. Skruck's "Motion to Suppress Evidence Acquired Through Warrantless Dumpster Searches and to Suppress All Evidence Derived Therefrom," filed on October 16, 2014. (Docket No. 363.) The Government filed its response on October 21, 2014. (Docket No. 367.) United States District Judge Irene M. Keeley referred this matter to the undersigned on October 20, 2014. (Docket No. 366.) On November 12, 2014, came Defendant, in person and by counsel, Harry A. Smith III, and the United States by its Assistant United States Attorney, Robert H. McWilliams, Jr., for hearing on Defendant's motion. On November 19, 2014, Defendant filed a "Supplement to Motion to Suppress." (Docket No. 381.)

### I. PROCEDURAL HISTORY

On April 17, 2012, a Grand Jury sitting in the Northern District of West Virginia returned an Indictment against Defendant and his co-defendants, charging them with various drug-related and money laundering violations. (Docket No. 1.) Defendant was arraigned before the undersigned on April 23, 2012, at which time he entered a plea of "Not Guilty" to all counts. That same day, the undersigned denied the Government's motion to detain Defendant and released him pursuant to an Order Setting Conditions of Release. (Docket Nos. 87 and 104.) On June 12, 2012, Judge Keeley

granted the Government's motion to declare this matter as a complex case. (Docket No. 106.)

On February 5, 2013, the Grand Jury returned a Superseding Indictment, charging Defendant with various drug-related and money laundering violations.[1] (Docket No. 218.) Defendant was arraigned before the undersigned on February 6, 2013, at which time he entered a plea of "Not Guilty" to all counts. On February 13, 2013, Judge Keeley entered an Order granting the parties' joint oral motion to continue trial and setting trial for May 14, 2013. (Docket No. 228.) On May 1, 2013, she denied Defendant's subsequent motion to continue trial. (Docket No. 247.)

On May 13, 2013, Defendant's Adult Pretrial Services Officer filed a Petition for Action on Conditions of Pretrial Release, alleging that Defendant had not returned to his approved residence in Bridgeport, West Virginia. The undersigned issued an arrest warrant for Defendant's violation of his conditions of release. (Docket No. 260.) On May 16, 2013, Judge Keeley entered an Order noting that Defendant had not yet been found and continuing the trial until September 4, 2013. (Docket No. 264.) On August 12, 2013, Judge Keeley entered an Order cancelling the jury trial and setting a status conference for September 6, 2013. (Docket No. 292.) Following the status conference, she entered an Order continuing the jury trial until March 17, 2014. (Docket No. 298.)

Defendant was arrested on January 18, 2014, in the District of New Mexico. On February 12, 2014, his retained counsel, Mr. Thorn Thorn, filed a motion to withdraw as attorney. (Docket No. 325.) The undersigned granted that motion and directed the Federal Public Defender to appoint counsel to represent Defendant. (Docket No. 327.) On February 14, 2014, Harry A. Smith, III, was appointed as Defendant's counsel. (Docket No. 328.) On February 25, 2014, Defendant appeared

---

[1] By this time, co-defendants Paglia, Phillips, and Calip had all entered pleas of guilty to charges contained in the original Indictment. Corporate defendants Jemrose, Inc. and Pag-Corp, Inc. were dismissed with prejudice on September 10, 2013.

2

before the undersigned for a bond revocation and detention hearing; his bond was revoked and he was remanded to the custody of the United States Marshal Service. (Docket No. 336.) At that hearing, Defendant's counsel made an oral motion to continue the jury trial scheduled for March 17, 2014, given his recent appointment. (Docket No. 334.) Judge Keeley granted that motion (Docket No. 338) and entered an Order scheduling the jury trial for September 22, 2014. (Docket No. 341.) On July 23, 2014, Defendant, through counsel, filed a motion for continuance of trial. (Docket No. 354.) Judge Keeley granted that motion on July 31, 2014. (Docket No. 355.) Jury trial is now scheduled to begin on January 12, 2015.

## II. CONTENTIONS OF THE PARTIES

Defendant requests that the Court "suppress all evidence acquired by the Government as a result of at least nine warrantless 'trash pull' searches of a dumpster located on the premises of Hot Stuff and Cool Things in Clarksburg, West Virginia." Defendant also seeks the suppress of "all evidence derived as a result of such searches, which evidence substantially provided the basis for multiple search warrants." (Docket No. 363.) In support of his motion, Defendant asserts:

1. Defendant was employed by or was a business consultant to Jeffrey Paglia, the owner and operator of Hot Stuff and Cool Things ("HSCT");

2. HSCT maintained a locked commercial dumpster, for its use only, on its business premises in Clarksburg;

3. On at least nine (9) occasions, agents from the task force carried out after-hours "trash pulls;"

4. Defendant and HSCT had a reasonable expectation of privacy in that dumpster; and

5. The "fruit of the poisonous tree" extends to all evidence seized pursuant to search warrants based upon the unlawful trash pulls.

(Docket No. 363-1 at 1-3.)

3

The Government contends that Defendant's motion should be denied because "[a]n employee or consultant to a business does not have a legitimate expectation of privacy in a dumpster leased by a company for which he may have been working or consulting." (Docket No. 367 at 1.) The Government further contends that the dumpster was never locked and that "on one occasion agents found trash in the dumpster from another store in the plaza where it was located." (Id.)

### III. STATEMENT OF THE FACTS

The undersigned heard the testimony of Cary Riddle, District Manager for Waste Management of West Virginia, Inc. ("Waste Management"), and Lieutenant Brian Purkey of the Bridgeport, West Virginia, Police Department, who is currently assigned to the Greater Harrison County Drug Task Force. The undersigned also admitted into evidence: (1) copies of billing invoices from Waste Management to HSCT for the period of August 1, 2011 through April 1, 2012; and (2) an aerial photograph of the HSCT location in Clarksburg, West Virginia. (Docket No. 379-1 to -2.) The Court also takes notice of the "Application and Affidavit for Search Warrant" attached to Defendant's motion. (Docket No. 363-2.) The undersigned finds that all testimony is credible, and finds the following facts:

On August 30, 2010, co-defendant Jeffrey Paglia created Jemrose, Inc., the parent company of HSCT. Through Jemrose, Inc., Paglia was the owner and operator of the HSCT store located at 603 Rosebud Plaza in Clarksburg, West Virginia, and an HSCT store located in Buckhannon, West Virginia. (Docket No. 363-2 at 7.) Paglia, through Jemrose, Inc., leased the property located at 603 Rosebud Plaza. Defendant was a "partner" of Paglia's and had supervisory authority over some employees. However, there is no evidence before the Court that Defendant's name was included on either the lease for 603 Rosebud Plaza or on the records filed with the West Virginia Secretary of

4

State that created Jemrose, Inc. Surveillance conducted during the investigation indicated that Defendant spent more time at the Buckhannon store; at times he would go to the Clarksburg location in the morning, travel to Buckhannon, and come back to the Clarksburg store around closing time.

From August 1, 2011, until April 1, 2012, HSCT contracted with Waste Management for trash collection services at the Clarksburg location. Waste Management provided HSCT with one (1) two-cubic-yard front load dumpster. (Docket No. 379-1.) The account with Waste Management listed HSCT as the only customer. The dumpster was marked with Waste Management's telephone number and logo. Mr. Riddle testified that the dumpster provided to HSCT would have been approximately three (3) feet across the top, four (4) feet deep, and eight (8) feet wide. The dumpster provided to HSCT opened at the top for trash placement and was a locked dumpster. Such dumpster contained a bar lock that automatically unlocked when a trash truck picked up the dumpster and tilted it at a certain angle. Waste Management charged HSCT $65.71 per month during this time period. Such charge included a $10.00 fee for the locked dumpster. Trash was collected from the dumpster at HSCT every other week.

Mr. Riddle testified that for locked dumpsters, Waste Management could provide the customer a lock with a key. Alternatively, the customer could provide its own lock. To gain access to the interior of the dumpster, the customer could unlock the lock, which would cause the lock bar to fall. Whoever had a key to the lock could open the dumpster. If the dumpster was not locked, anyone could gain access to it. Mr. Riddle did not know if Waste Management provided a lock to HSCT for the dumpster, or if HSCT made efforts to keep the dumpster locked.

Lieutenant Purkey was the chief investigating officer in this matter. During the investigation, Lieutenant Purkey and other Task Force officers conducted more than twelve (12) trash pulls from

5

the dumpster located at the HSCT store in Clarksburg. These trash pulls were conducted late at night, often around midnight or later. He conducted a trash pull at least every other week; at times, he conducted trash pulls once or twice per week. He did not determine who was the owner or lessee of the dumpster and never got permission from anyone to conduct trash pulls. Lieutenant Purkey primarily pulled large black trash bags; at times, he and other officers pulled smaller white kitchen trash bags and trash contained in plastic grocery bags. According to Lieutenant Purkey, the dumpster was located approximately twenty-five (25) to thirty (30) feet away from the side of the Clarksburg store, between HSCT and Huntington Bank. (Docket No. 379-2.) There was nothing blocking access to the dumpster, such as a fence. To the best of Lieutenant Purkey's knowledge, the store was closed every time trash was pulled, and it was never pulled if someone appeared to be inside HSCT.

While conducting trash pulls, Lieutenant Purkey never found the dumpster at HSCT to be locked. On the occasions when he was not present at the trash pulls, he never received information that the other officers could not access the dumpster because it was locked. During one trash pull, Lieutenant Purkey located multiple bags containing trash from Huntington Bank. At other times, he noted that trash was piled in the dumpster to the point where the lid would not close. On one "really cold" night, Lieutenant Purkey saw individuals wearing peacoats going into the dumpster. He approached them, showed his badge, and asked what they were doing. The individuals replied that they were hungry and were looking for food.

Based upon the evidence gleaned from the trash pulls, Lieutenant Purkey prepared an "Application and Affidavit for Search Warrant" that was sworn to before the undersigned on April 17, 2012. (Docket No. 363-2.) That affidavit was used to support search warrants for the locations, persons, and businesses listed in the affidavit. (Id. at 3-4.) The evidence obtained from the trash

6

pulls and that obtained from execution of the search warrants forms a substantial portion of the Government's case against Defendant.

In his post-hearing "Supplement to Motion to Suppress," Defendant states in pertinent part:

Defendant's counsel has spoken with Jeremia Phillips, a co-defendant, residing in Spokane, Washington, who advises as follows:

a. That the intention of HSCT was to lock the dumpster every night;

b. That the dumpster was generally locked;

c. That, because keys to the lock were occasionally lost, by HSCT, a few replacement locks had to be purchased;

d. That, to remove the locks that were being replaced, HSCT had to purchase a boltcutter from Home Depot;

e. That he is unsure if the dumpster was locked, as a matter of policy, when he began working for HSCT in August, 2011, but the procedure thereafter was to keep it locked; and

f. That on some occasions the dumpster was not locked.

Defendant's counsel has also spoken with Derrick Calip, a co-defendant, who resides in Houston, Texas, who advises that the dumpster was supposed to be locked, that he was aware of times that it was locked, although there were times that it was not locked.

Defendant's counsel has also spoken with Shirley Sheets, a bookkeeper who worked for HSCT, who advises that there were concerns about interlopers putting trash in the dumpster; but she was unaware of whether the dumpster was locked.

(Docket No. 381 at 1-2.)

## IV. ANALYSIS

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It is well established that this provision applies to commercial premises, as a "businessman, like the

7

occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." See v. Seattle, 387 U.S. 541, 543 (1967). A defendant can challenge a search and seizure on Fourth Amendment grounds only if "the disputed search and seizure has infringed an interest of the defendant which the fourth amendment was designed to protect." Rakas v. Illinois, 439 U.S. 128, 140 (1978). The Supreme Court has noted that the appropriate inquiry is whether the individual had a reasonable expectation of privacy in the area searched. Rawlings v. Kentucky, 448 U.S. 98, 104-06 (1980). The burden is on the defendant to prove his reasonable expectation of privacy. Rakas, 439 U.S. at 130 n.1. To determine whether a defendant has met his burden, the Fourth Circuit has stated:

> The factors we must use to determine whether the individual retained a reasonable expectation of privacy in the [area searched] can be stated generally as an analysis of the defendant's interest in and control of the area searched, his subjective expectation of privacy in the area as evidenced by his efforts to ensure that privacy, and society's willingness to recognize his expectation as reasonable.

United States v. Horowitz, 806 F.2d 1222, 1225 (4th Cir. 1986) (alteration in original).

In California v. Greenwood, 486 U.S. 35, 37 (1988), the Supreme Court held that warrantless searches and seizure of garbage left for collection outside the curtilage of a home do not violate the Fourth Amendment. In Greenwood, officers asked Greenwood's regular garbage collectors to turn over Greenwood's garbage to them after it had been collected. Id. The garbage that was collected was in sealed bags placed at the curb in front of his house. Id. A search of Greenwood's trash revealed items indicative of narcotics use and trafficking. Id. at 37-38. In holding that Greenwood's Fourth Amendment rights had not been violated, the Court noted that the search and seizure would violate the Fourth Amendment only if the defendant manifested a subjective expectation of privacy in the garbage that "society [was] prepared to accept . . . as objectively reasonable." Id. at 39. The

8

Court specifically stated:

> It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public. . . . Moreover, respondents placed their refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so. Accordingly, having deposited their garbage "in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it," . . . respondents could have had no reasonable expectation of privacy in the inculpatory items that they discarded.

Id. at 40-41 (internal citations omitted).

However, Greenwood is not determinative of the matter here, as this case involves a dumpster located on commercial property, not garbage set out on the curb by an individual's home. The Supreme Court "has consistently stated that a commercial proprietor has a reasonable expectation of privacy only in those areas where affirmative steps have been taken to exclude the public." United States v. Hall, 47 F.3d 1091, 1096 (11th Cir. 1995) (citing Air Pollution Variance Bd. of Colo. v. W. Alfalfa Corp., 416 U.S. 861, 865 (1974)). As the Eleventh Circuit stated in Hall, a "failure to exclude the public takes on increased significance when the asserted expectation of privacy is in discarded garbage." Id.

At issue in Hall was a warrantless search of a dumpster located near the officers of Bet-Air, "a closely held Miami-based seller of spare aviation parts and supplies." Id. at 1092-93. In 1988, the United States Customs Service began "investigating allegations that Bet-Air was supplying restricted military parts to Iran." Id. at 1093. As part of the investigation, an agent entered Bet-Air's property "and removed a bag of paper shreddings from a garbage dumpster located near the Bet-Air offices in a parking area reserved for Bet-Air employees." Id. As the Eleventh Circuit noted, the agent "had to travel forty yards on a private paved road," but "[n]o signs indicated that the provide

9

was private." Id. The agent used the shredded documents retrieved from the dumpster "as the basis for obtaining a search warrant of the Bet-Air premises." Id. Hall was subsequently convicted of fourteen counts of "violating various federal laws in connection with Bet-Air's sale of restricted military equipment parts to Iran." Id. at 1092.

On appeal, Hall challenged the denial of his motion to suppress. The Eleventh Circuit determined that "the manner in which Bet-Air disposed of its garbage serves only to demonstrate that Bet-Air manifested a subjective expectation of privacy in its discarded garbage." Id. at 1094. Nevertheless, the court concluded that "Bet-Air did not take sufficient steps to restrict the public's access to its discarded garbage; therefore, its subjective expectation of privacy is not one that society is prepared to accept as objectively reasonable." Id. at 1097. As the panel noted,

> A commercial proprietor incurs a similarly diminished expectation of privacy when garbage is placed in a dumpster which is located in a parking lot that the business shares with other businesses, and no steps are taken to limit the public's access to the dumpster. It is common knowledge that commercial dumpsters have long been a source of fruitful exploration for scavengers.

Id. at 1096. Therefore, the court concluded, the district court did not err in denying Hall's motion to suppress. Id. at 1099.

The Seventh Circuit considered a similar situation in United States v. Dunkel, 900 F.2d 105 (7th Cir. 1990), vacated and remanded on other grounds by Dunkel v. United States, 498 U.S. 1043 (1991). Dr. James Dunkel, a dentist, quit filing tax returns in 1981. Id. at 106. He also "started keeping two sets of books, excluding from one any cash receipts and checks that were endorsed over to his staff to pay their salaries without going through his bank accounts." Id. Some of the evidence against Dunkel came from financial records found in a dumpster located near his office building. Id. Specifically,

10

> Dunkel owned and maintained his offices in a building that housed two other dentists and five business tenants. All used the same dumpster, which was located off the parking lot of the building, more than 55 feet from the nearest part of the structure. Dunkel's patients and employees, and those visiting other tenants of the building, used the parking lot. Anyone in the parking lot could walk up to the dumpster; the trash hauler that emptied the dumpster came in through the parking lot and needed no key or other entreé.

Id. In affirming the denial of Dunkel's motion to suppress, Judge Easterbrook, writing for the panel, noted that "[s]omeone who tosses documents into a dumpster to which hundreds of people have ready access has no legitimate expectation of privacy in the dumpster or its contents." Id. at 107.

The undersigned finds Hall and Dunkel to be instructive for disposition of Defendant's motion to suppress. Like the dumpsters at issue in those two cases, the dumpster at the Clarksburg HSCT store was located in an area open to the public. While the dumpster was located only twenty-five (25) to thirty (30) feet away from HSCT, the fact remains that anyone could walk up to the dumpster, as evidenced by Lieutenant Purkey's observation and questioning of individuals looking for food in the dumpster.

Furthermore, while HSCT paid $10.00 extra per month to Waste Management for a locked dumpster, the record reflects that the locking mechanism was not used on a consistent basis. As noted above, co-defendants Jeremia Phillips and Derrick Calip have both informed Defendant's counsel that while the dumpster was supposed to remain locked, there were times when the dumpster was not locked. (Docket No. 381 at 1-2.) Nevertheless, even if the dumpster had been locked on several occasions, the evidence presented during the hearing reflects that during one trash pull, Lieutenant Purkey located multiple bags of trash from the Huntington Bank branch located near HSCT. Such trash could only have been put in the dumpster if the dumpster was not locked. Furthermore, the dumpster was never locked when Lieutenant Purkey or other agents pulled trash.

11

Given the record, the undersigned finds that neither Defendant nor anyone else involved with the operation of HSCT took consistent "affirmative steps . . . to exclude the public" from the dumpster. Hall, 47 F.3d at 1096, 1097. If Defendant or other employees of HSCT had actually utilized the locking mechanism at all times, perhaps the undersigned's analysis would be different. See United States v. Varjabedian, No. 05-10103-GAO, 2006 WL 1004847, at *2-3 (D. Mass. Apr. 14, 2006) (finding objective expectation of privacy in trash placed in a dumpster that was secured by chains and a lock). While it may have been HSCT's intention to lock the dumpster every night, the undersigned cannot reasonably find that an intention translates into an "affirmative step[] . . . to exclude the public." Hall, 47 F.3d at 1096.

Accordingly, the undersigned find that neither Lieutenant Purkey nor any of the officers who participated in the trash pulls "infringed upon any societal values the Fourth Amendment protects" when they searched the dumpster located at the Clarksburg HSCT store. Hall, 47 F.3d at 1097. Because neither the owner nor the employees of HSCT, including Defendant, took consistent, affirmative steps to exclude the public from accessing the dumpster, Defendant's "subjective expectation of privacy is not one that society is prepared to accept as objectively reasonable." Id.

## V. RECOMMENDATION

For the reasons stated herein, it is **RECOMMENDED** that Defendant's "Motion to Suppress Evidence Acquired Through Warrantless Dumpster Searches and to Suppress All Evidence Derived Therefrom" (Docket No. 363) be **DENIED**.

Any party may, within fourteen days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy

of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 20 day of November, 2014.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE